COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPREME JUDICIAL COURT
                                               FOR SUFFOLK COUNTY
                                               NO. BD-2015-039


IN RE:  JOHN T. LAMOND



MEMORANDUM OF DECISION

This matter came before me on an information filed by the
Board of Bar Overseers (board) pursuant to S.J.C. Rule 4:01,
§ 8(6), recommending that the respondent be suspended
indefinitely from the practice of law in the Commonwealth.  The
respondent does not contest the findings of fact on which the
board's recommendation is based, but he maintains that a lesser
sanction is warranted.  For the reasons explained below, I
conclude that the sanction recommended by the board is
appropriate and shall be adopted.

1.  Facts.[1]  In 2008, the niece of Gaynell Hayes, an elderly
testatrix, contacted the respondent and asked him to assist her
family with respect to certain transactions her aunt had entered

_____

[1] The facts are taken from the hearing committee's findings
of fact, adopted by the board.

into concerning an apartment building that she owned. Specifically, Hayes had revised her will to benefit a local handyman and to remove as beneficiaries two family members and a close friend named in a prior will; had given the handyman a power of attorney; and had transferred her apartment building to him for $100.  Within a month of the transfer from Hayes, the handyman accepted an offer of approximately $1.4 million for the building.  Hayes's 2008 will also named the handyman as a co-executrix, while removing Hayes's niece from that role, which she had held under the terms of Hayes's 2004 will.

The respondent immediately took action to reverse the course of these transactions.  He met with Hayes and had her sign a power of attorney in favor of her niece, as well as an affidavit that she had no memory of having sold her building to the handyman.  The respondent filed a civil action alleging undue influence, and succeeded in obtaining a temporary restraining order prohibiting the handyman's sale of the building.

The respondent also contested the handyman's petition for guardianship over Hayes and sought instead to have Hayes's niece appointed as guardian.  The respondent was successful in contesting the handyman's guardianship, but a Probate and Family Court judge appointed an independent attorney as Hayes's guardian.  The guardian requested and received permission to

sell the building; he made the sale in December, 2008, and held the proceeds in escrow pending the outcome of the complaint alleging undue influence.

Shortly after Hayes's death on March 28, 2009, her grandniece, Samantha Edwards, and two other beneficiaries under the 2004 will, each signed a twenty-two percent contingent fee agreement with the respondent to represent them in the impending will contest.  The respondent and the handyman then filed petitions for the probate of the 2004 and 2008 wills, respectively.  A Probate and Family Court judge appointed a neutral administrator for Hayes's estate.

In September, 2009, the dispute over the wills was settled through mediation.  Under the terms of the settlement agreement, the handyman was to receive seventy per cent of the net proceeds from the sale of the apartment building (approximately $700,000) and the respondent's clients, the three former beneficiaries disinherited under the 2008 will, were to receive thirty per cent (approximately $300,000).[2]  One month later, after the Probate and Family Court judge approved the settlement agreement, the court-appointed guardian distributed the net proceeds (approximately $1.05 million) to the administrator of

---

[2] Each client's share was approximately $70,800; the respondent's contingent fee waa $61,418.

Hayes's estate. The hearing committee commended the respondent for this work, stating that "the respondent's legal work throughout this period was thorough and effective, and we note that he achieved an excellent result for his clients."

The administrator disbursed the funds in three installments, spread over roughly eigheen months, from November, 2009, through May, 2011. In November, 2009, the respondent sent the three clients checks for their respective share of the first installment ($240,000) that he received from the administrator, less his contingent fee and expenses in the amount of $5,798. With the checks, the respondent included a letter detailing these expenses. In April and June, 2010, the respondent wrote to his clients to inform them that the administration of the estate was almost complete, and that the "final payments" would be forthcoming. In July, 2010, the respondent received three checks from the administrator, one for each of his clients. After subtracting the amount of his twenty-two per cent contingent fee, the respondent sent the three clients the balance of the amount of these checks, along with a letter stating the amount he had received and the amount of their respective shares, after subtracting the amount of his contingent fee. In May, 2011, the respondent received a third check from the administrator, in the amount of $8,173.13. Unlike the earlier checks, this check was payable to him, and

4

listed the names of the three clients on the memo line.  Without notifying the clients that he had received this check, the respondent deposited it into his operating account, rather than into his IOLTA account.  By September, 2011, he had disbursed almost all of those funds on unrelated matters.

Between late May and September, 2011, Edwards repeatedly attempted to contact the respondent with regard to the final distribution from the estate, but the respondent did not respond to her calls and she was unable to reach him.  Edwards then contacted bar counsel.

In October, 2011, bar counsel sent the respondent a copy of Edwards's complaint.  On November 21, 2011, he sent a check to Edwards for $2,125.01, her share of the amount of the final distribution.  The respondent paid Edwards using a check from his IOLTA account, after having transferred $2,300 from his payroll account to his IOLTA account earlier that day.  The respondent sent a copy of the check to bar counsel.  The respondent did not include any statement of accounting with the final disbursement to Edwards, did not notify his other two clients who were beneficiaries of the settlement agreement that he had received the third disbursement due them, and did not issue any payments to them.

Bar counsel then notified the respondent that he owed each client an additional $282.  The respondent sent this amount to

Edwards on December 22, 2011, and to his other two clients in
June and July, 2013.

2. <u>Procedural history</u>.  On August 5, 2013, bar counsel
filed a petition for discipline with the board.  The petition
alleged that the respondent:  intentionally misused client
funds; failed to remit client funds and give required notices
and accountings; ignored a client's reasonable requests for
information; and ignored bar counsel's request for records.  The
respondent filed his answer on November 5, 2013.

A hearing committee, see S.J.C. Rule 4:01, § 8(3), second
par, conducted a two-day hearing in May, 2014, at which four
witnesses, including the respondent, testified, and thirty-five
exhibits were introduced in evidence.  As he has throughout
these proceedings, the respondent represented himself at the
hearing.  At the outset of the hearing, bar counsel requested
the committee also to consider a new and unrelated complaint
against the respondent, which bar counsel described as "raising
very serious allegations" against him.  At that point, the
respondent had yet to receive a copy of the new complaint.  The
hearing committee denied bar counsel's request to consolidate
the two complaints.

The hearing committee determined that the respondent
intentionally misused his clients' shares of the final check.
It did not credit his testimony that the misuse was

6

unintentional because, due to poor recordkeeping, he believed he
was owed the entire $8,173.13 for fees and expenses. In
particular, the committee pointed to the respondent's
inconsistent explanations for this misunderstanding. At various
points, the respondent had asserted that he had discarded his
record of expenses with the file; the file was too voluminous to
keep track of expenses; he had changed secretaries; and he
opened a new file after the first file grew too large, but did
not transcribe expense amounts that had been recorded in the
original file. The committee also found that the respondent's
response to Edwards's complaint did not evince an intent to
remedy a mistaken misuse of her funds. Rather than placing the
purportedly disputed funds in escrow, the respondent wrote
Edwards a check for the full amount due approximately one month
after receiving notice of her complaint. In addition, he
delayed notifying his other two clients about the final
disbursement, or paying them their shares of the final check for
almost another two years.

The committee also did not credit the respondent's
testimony that he had not expected to receive the final check
for two reasons. First, prior to the hearing, the respondent
made statements referencing a third check, contradicting his
testimony at the hearing. Second, the committee reasoned that
if the respondent had not expected a third check, he would have

7

taken funds from the administrator's second distribution to pay
his claimed expenses.

The committee determined that the respondent's intentional
misuse of client funds, and the resulting deprivation, violated
Mass. R. Prof. C. 8.4(c) and 8.4(h); his failure to safeguard,
promptly transfer, or promptly inform his clients of receipt of
their funds violated Mass. R. Prof. C. 1.2(a), 1.3, 1.15(b) and
1.15(c); his depositing of the final check in his operating
account rather than in a trust account violated Mass. R. Prof.
C. 1.15(b); his omission of an accounting to his clients
violated Mass. R. Prof. C. 1.5(c) and 1.15(d)(1); and his
failure to respond to Edwards's attempts to contact him violated
Mass. R. Prof. C. 1.4(a).  The committee did not find any
factors in mitigation or in aggravation.  It gave no weight to
the respondent's proposed mitigating factors of a lack of prior
discipline, his expression of "deep remorse," and his
inexperience in law firm administration or the requirements of
Rule 1.15 as to the handling, recordkeeping, and reporting of
client funds.

Ultimately, based on the presumptive sanction for
intentional misuse of client funds with deprivation, where
restitution has been made, see Matter of LiBassi, 449 Mass.
1014, 1016 (2007), the committee recommended that the respondent
be indefinitely suspended from the practice of law.  The

committee noted, however, that it felt "constrained by the case law" to recommend this sanction.  See, e.g., Matter of Schoepfer, 426 Mass. 183, 186 (1997).  Otherwise, the committee wrote, it would have recommended a much shorter term of suspension because of the respondent's extremely effective representation of his clients, the relatively small amount of funds misused, and the possibility that an indefinite suspension would end his law practice as he is now in "the twilight of his career."  The board adopted the hearing committee's credibility determinations and finding of intentional misuse.  As did the hearing committee, the board recommended the respondent be indefinitely suspended, while also expressing similar reservations about the strict application of the presumptive sanction in this case.

At a hearing before me, bar counsel stated that he accepts the board's recommendation of an indefinite suspension.  The respondent maintained that only a public reprimand was appropriate.

3.  Discussion.  The primary purpose of the attorney disciplinary rules and disciplinary proceedings is "to protect the public and maintain its confidence in the integrity of the bar and the fairness and impartiality of our legal system."  See Matter of Curry, 450 Mass 503, 520-521 (2008), and cases cited. In determining the appropriate sanction to impose, I accord

9

substantial deference to the board's recommendation.  See Matter of Griffith, 440 Mass. 500, 507 (2003), while remaining cognizant that the sanction imposed must not be "markedly disparate" from sanctions imposed on attorneys found to have committed comparable violations.  See Matter of Goldberg, 434 Mass. 1022, 1023 (2001), and cases cited.  At the same time, I must decide each case "on its own merits," see Matter of the Discipline of an Attorney, 392 Mass. 827, 837 (1984), and must ensure that the offending attorney "receives the disposition most appropriate in the circumstances."  See Matter of Curry, supra at 591.

As the hearing committee and the board correctly stated, the presumptive sanction for an attorney's intentional use of client funds, with the intent permanently or temporarily to deprive the client of the funds, or where actual deprivation results, regardless of the attorney's intent, is indefinite suspension or disbarment.  See Matter of Sharif, 459 Mass. 558, 565 (2011); Matter of Schoepfer, supra at 187.  An offending attorney has a "heavy burden" to establish mitigating factors sufficient to warrant a deviation from the presumptive sanction. Matter of Schoepfer, supra.  A reviewing court will apply the presumptive sanction absent "clear and convincing reasons" for a lesser sanction.  Id. at 188.  See, e.g.,  Matter of Sharif, supra at 567.  Where, as here, the offending attorney has made

10

restitution of the client's funds, the appropriate sanction generally is indefinite suspension rather than disbarment.  See Matter of LiBassi, supra  at 1017.

Here, substantial evidence supports the board's and the hearing committee's finding that the respondent intentionally misused his clients' funds, temporarily depriving them of those funds.  After twice sending his clients checks he received on their behalf from the administrator of Hayes's estate, the respondent failed to forward the third and final check. Instead, he deposited that check into his operating account, without notifying his clients, and, within about three months, he had spent almost all of those funds on unrelated matters. While the check was payable to him, it explicitly listed the names of his three clients on the memo line.  When one of his clients repeatedly sought information about the third disbursement from the estate, the respondent refused to return her calls or to disburse the funds he knew were due to her and the other two clients.  Only after disciplinary proceedings were commenced did the respondent pay one of the three clients, while delaying for close to two more years before paying the moneys due the other two cilents.

Although the respondent contends that his misuse was unintentional, the hearing committee did not credit his testimony to that effect, and they were entitled to do as they

11

did.   See S.J.C. Rule 4:01, § 8(3) (hearing committee is "the
sole judge of the credibility of the testimony presented at the
hearing").   See, e.g., Matter of Saab, 406 Mass. 315, 328 (1989)
(hearing committee declined to credit respondent's testimony
over complainants' testimony where it made reverse credibility
determination).

     As noted, many of the respondent's statements, and many
aspects of his conduct, support the hearing committee's decision
not to credit his claim of inadvertent misuse.   For instance,
the committee noted the respondent's varied and inconsistent
explanations for his conduct.   In one statement, he said he
could not keep track of his expenses due to the large size of
the physical file, while, in another instance, he said he had
thrown out his record of expenses.   The committee also found
that the respondent's failure to deduct his expenses from the
second check undermined his claimed belief that the second
distribution would be the last, and that he was owed the third
check as reimbursement of his expenses, because, had he believed
the second checks to be the final disbursement from the estate,
he would have deducted his expenses from that disbursement.
Further, the respondent only made partial restitution after he
learned that one of his clients had filed a complaint with bar
counsel, about three months after he received and deposited the
final check, and after disregarding multiple requests for that

payment. Moreover, immediately before he made restitution to the complaining client, the respondent shifted funds from his payroll account to his IOLTA account so that he could make the payment from his IOLTA account, indicating what appears to have been a knowing effort to avoid the appearance of improper comingling of client funds. The hearing committee also rejected the respondent's contention that he was inexperienced in account administration and law office management, noting that even an inexperienced attorney would have known that he should pay a client funds received on the client's behalf, rather than spending them on unrelated matters.

The respondent also offers several other arguments in support of his contention that the appropriate sanction here is a public reprimand. The respondent argues that the hearing committee's decision to exclude evidence of his efforts on behalf of his clients was error; that the hearing committee erred in crediting any of Edwards' testimony because portions of her testimony had been shown to be false; and that the committee's finding that the respondent had failed to respond to Edwards' requests for information also was not supported by the evidence. These arguments are unavailing. The hearing committee's findings were based on substantial evidence, and the credibility determinations were for it to make, after seeing and hearing the witnesses. "The hearing committee is the sole judge

13

of the testimony presented at the hearing." Matter of Moore, 442 Mass. 285 (2004). See, e.g, Matter of Abbott, 437 Mass. 384, 393-394 (2002), and cases cited; Matter of Saab, supra. The committee noted many instances in which it concluded that Edwards was not credible, her testimony was self-serving, contrary to other evidence in the record, or not physically possible; the committee explicitly chose not to rely on much of her testimony. The committee stated also however, that, notwithstanding the numerous statements which were contrary to the record evidence and which it deemed not believable, it concluded that Edwards had in fact sought to contact the respondent for a number of months to inquire about the payment of the third installment, as she testified, and he had not responded to her calls.

The respondent argues further that bar counsel's request at the outset of the proceedings to join an unrelated, then newly filed complaint with the current proceedings unfairly tainted the entire hearing. The board noted that consolidation is routine, and determined that the respondent's argument that bar counsel's request to consolidate subtly prejudiced the hearing

committee was "sheer speculation."  The record does not suggest
otherwise.[3]

The respondent does not dispute that he did not deposit the
third disbursement into his IOLTA account, and did not inform
the clients of its arrival or pay them any of the funds until,
at a minimum, months thereafter.  Even if the committee had
credited his testimony that the misuse was unintentional (and it
found, explicitly and repeatedly, that such was not the case),
the deprivation still would have warranted an indefinite
suspension under the terms of <u>Matter of Schoepfer</u>, 426 Mass.
183, 186 (1997) and its progeny.  While the reservations of the
hearing committee and the board about the strict application of
disciplinary precedent to the respondent's situation are
understandable, they do not carry the day.  That the respondent
had achieved such an excellent result for his clients, or that
the amount of money at issue in the third disbursement was

---

[3] Nonetheless, I recognize that the self-represented
respondent, with no prior disciplinary history or evident
familiarity with such proceedings, could well have been made to
feel at an unanticipated disadvantage, being knocked off his
stride, as it were, by the motion brought shortly before his
previously scheduled evidentiary hearing was to begin.  He had
no prior notice of the motion to consolidate nor of the fact or
substance of the new and "very serious" case to which the motion
referred.  Given this, it is difficult to believe that the
hearing committee would have allowed the motion in any event.
The timing of the otherwise permissible motion is at least
unfortunate in the circumstances.

small, do not, as the board properly concluded, serve as mitigating factors under our existing jurisprudence, where he thereafter intentionally misused a portion of the funds he obtained.  Cf. <u>Matter of Johson</u>, 444 Mass. 1002, 1003 (2005); <u>Matter of Dragon</u>, 440 Mass. 1023, 1024 (2003).  Contrast <u>Matter of Murry</u>, 455 Mass. 878, 885 (2010>).

4. <u>Conclusion</u>.  For the foregoing reasons, an order shall enter indefinitely suspending the respondent from the practice of law in the Commonwealth.

By the Court

Barbara A. Lenk
Associate Justice

Entered:        January 7, 2016

A True Copy
Attest

1-7-15
Date

Assistant Clerk

16

